**R.B. UNDERWOOD, INC., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–97–01428–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

April 27, 2000.

Rehearing Overruled June 29, 2000.

Bruce D. Mosier, Michael A. McEnrue, Houston, for Appellant.

Hazen E. Woods, Austin, for Appellee.

Panel consists of Justices MIRABAL, WILSON, and TAFT.

## OPINION

DAVIE L. WILSON, Justice.

Appellant, R.B. Underwood, Inc. ("Underwood") appeals from a final judgment, after a jury trial, awarding Underwood $153,061.71 in a condemnation case. Underwood contends the trial court erred (1) by determining pretrial that Underwood suffered no substantial and material impairment of access and (2) by allowing the State's appraiser to testify to a value reported in an earlier appraisal report, rather than confining his testimony to the most recent report produced during discovery. We affirm.

### Factual and Procedural Background

Underwood operates a mini-warehouse that abutted the frontage road of the Eastex Freeway. The property was directly connected to the frontage road by a driveway. The State removed the old frontage road and constructed a new, elevated frontage road, which eliminated direct access to the frontage road from Underwood's property. The State acquired an 8.2–foot strip along the westernmost part of Underwood's property to accommodate the elevated frontage road.

During more than six years of construction, the State removed Underwood's hard surface driveway; replaced it with a dirt driveway; and, at times, erected a barricade that partially blocked one lane of King Street, which ran along one side of Underwood's property. There were occasions when the street was blocked off for three or four hours; and, on a few occasions, it was blocked off for a day or two. Later, the State constructed a new driveway that pinwheeled around a column supporting the elevated frontage road and connected Underwood's property to King Street. King Street was changed from a dead-end street to a street that connected to another street on the west side of the Eastex Freeway.

R.B. Underwood testified that before the construction, 40–foot Mayflower vans were able to get into the property by turning into the property's driveway from the frontage road. He estimated that, before construction, vans that size would be at the property three or four times a month. After construction began, these vans were no longer able to enter the driveway because of the difficulty in turning from King Street and maneuvering between the two pylons and into the driveway. R.B. Underwood admitted, however, that, before construction, it had been necessary for these vans to drive off the driveway and onto the State's right-of-way to make the turn.

Underwood also admitted that most of the people using his facility were not pro-

fessional drivers, but individuals who would use the larger rental vans. They had "a little difficulty." Underwood's appraiser, Raymond Woodard, testified normal-sized trucks could enter.

Stuart Corder, an engineer employed with the Right-of-Way Office for the Houston District, testified that the new Underwood driveway was constructed to accommodate large trucks with trailers or large delivery trucks, not the larger 40-foot vans. Corder did not design the driveway to accommodate the 40-foot vans because the driveway could not accommodate the larger vans before construction. In Corder's opinion, the only way the old driveway could have accommodated the larger vans was if the vans drove off the driveway.

The State initiated condemnation proceedings on November 15, 1989. *See* TEX. PROP.CODE ANN. § 21.012 (Vernon 1984). The county civil court at law appointed three special commissioners, who held a hearing and awarded Underwood $92,-250.00. *See* TEX. PROP.CODE ANN. §§ 21.014, 015, 048 (Vernon 1984).

Both the State and Underwood filed objections to the award. *See* TEX. PROP.CODE ANN. § 21.018 (Vernon 1984). The case was set for a jury trial. During discovery, the State provided Underwood with five reports from the State's expert witness, appraiser Waldo S. Luedemann. The value of the taking ranged from $20,950 and $51,069 in the earlier reports to $129,505 and $235,970 in the last reports.

At a pretrial evidentiary hearing, the trial court found that Underwood's remaining property had not suffered substantial and material impairment of access, thereby precluding the jury from hearing impairment evidence.[1] At trial, over Underwood's objection that Luedemann was testifying inconsistently with the most recent report, Luedemann opined that $51,069 would be just compensation for the taking. The jury found that Underwood

should be awarded $153,061.71, and the court rendered judgment on that amount.

## DISCUSSION

### Substantial and Material Impairment

■ To be compensated for impairment of access, a landowner must prove he suffered a substantial and material impairment of access to his land. *State v. Heal,* 917 S.W.2d 6, 10 (Tex.1996); *City of Waco v. Texland,* 446 S.W.2d 1, 2 (Tex.1969). In order to show material and substantial impairment, the property owner must establish (1) a total temporary restriction of access, (2) a partial permanent restriction of access, **or** (3) a partial temporary restriction of access due to illegal or negligent activity. *State v. Schmidt,* 867 S.W.2d 769, 775 (Tex.1993); *City of Austin v. Avenue Corp.,* 704 S.W.2d 11, 13 (Tex. 1986). The "material and substantial test" acknowledges situations in which the access for which the property was specifically intended is rendered unreasonably deficient even though normal access remains reasonably available. *Heal,* 917 S.W.2d at 10.

■ It is a question of law whether there is a "material and substantial impairment" to the remainder as a direct result of a taking. *Schmidt,* 867 S.W.2d at 777; *Precast Structures, Inc. v. City of Houston,* 942 S.W.2d 632, 636 (Tex.App.—Houston [14th Dist] 1996, no writ). We review questions of law de novo and without deference to the lower court's conclusion. *Heal,* 917 S.W.2d at 9; *Precast Structures,* 942 S.W.2d at 636. Before trial, the court must determine whether access rights have been materially and substantially impaired and control the admission of trial evidence accordingly. *Heal,* 917 S.W.2d at 9.

In its first issue presented, Underwood argues that the trial court erred in its pretrial determination that Underwood

1. *See State v. Heal,* 917 S.W.2d 6, 9 (Tex.    1996).

had not suffered a substantial and material impairment of access to its remaining property. Underwood contends the trial court should have found that a "substantial and material impairment" existed because the construction of the new driveway was such that large 40-foot vans were no longer able to maneuver around the pylons and enter the driveway.[2] Underwood also asserts that some of the smaller trucks have difficulty making the pinwheel turn around the pylons. Underwood relies on three cases: *Texland; DuPuy v. City of Waco,* 396 S.W.2d 103 (Tex.1965); and *Precast Structures.*

In *Texland,* the access to Texland's loading docks was partially blocked by piers supporting the City's viaduct. It became difficult, but not impossible, for trucks to maneuver in the area in front of the docks. The supreme court held there was a substantial and material impairment of access that was compensable as a damaging of properties for public use. *Texland,* 446 S.W.2d at 4.

*DuPuy* also involved the construction of a viaduct. As a result, the street on which DuPuy's property fronted was barricaded, leaving him in a cul de sac. The supreme court held the construction had deprived DuPuy of reasonable access to his property. *DuPuy,* 396 S.W.2d at 110.

The landowner in *Precast Structures* manufactured concrete beams and pillars. Its trucks hauled 125-foot beams. Before the city's taking an exit and a corner of Precast's property, Precast had used the old exit to carry the beams out to the city streets. Although the city built a new exit, using this exit was dangerous because it resulted in having truck traffic too close to stress beds where people were working and hydraulic jacks were pulling up to

1,000,000 pounds of stress. To use the new exit, it would have been necessary to relocate the stress bed and to route traffic through the plant, thereby requiring more turning radius for special trucks. If trucks hauling the 125-foot beams had used another exit, they would have had to negotiate a sharp curve and would have been forced over curbs and off the pavement, causing the beams to twist, crack, and possibly explode. *Precast Structures,* 942 S.W.2d at 634. The court held that Precast was entitled to a jury trial on the issue of damages, caused to the remainder of its property, which were directly attributable to impairment of its access. *Id.* at 637.

The facts of the preceding cases are distinguishable. In *Texland,* the lack of maneuverability after the taking reached such a level that the warehouse was virtually unusable for its intended purpose because trucks capable of transport could not access the property. *Texland,* 446 S.W.2d at 4. Unlike the property in *Texland,* Underwood's property remains accessible to most persons using his facility. Underwood testified that most persons who use his facility are not professional drivers, but "individuals." According to Underwood, such individuals tend to get the biggest rental vans and have, "a little difficulty." According to Corder, the new driveway was designed to accommodate trucks with trailers or large delivery trucks.

There is also no suggestion in *Texland, DuPuy,* or *Precast Structures* that any problems with accessibility existed before construction. Unlike the property owners in those cases, Underwood experienced accessibility problems before the taking. Forty-foot vans were not able to turn onto

---

2. We interpret Underwood as arguing that there was a partial, permanent impairment of access. Underwood devotes only two paragraphs to what might be construed as an argument resting on temporary impairment. On the question of total, temporary impairment, Underwood testified that, during construction, access was never totally blocked.

Woodard testified he never saw the road totally closed. On the question of partial, temporary impairment, Underwood asserts, without development, "While the construction of an entire widening project over a 6 year period may have been reasonable, the impairment of Underwood's access during all of that time certainly was not."

Underwood's property before construction without driving onto the State's right-of-way. Under these circumstances, Underwood cannot be said to have suffered a substantial or material impairment of access. *See Hammer v. City of Dallas*, 273 S.W.2d 646, 648 (Tex.Civ.App.—Fort Worth 1954, no writ) (holding that loss of use of land taken for angle parking could not be considered in awarding damages when such parking could not occur before street improvement without violating city ordinance or using part of city street).

We overrule Underwood's first issue.

## Appraiser's Opinion

█ In Underwood's second issue presented, it contends the trial court erred by allowing the State to contradict evidence from its last discovery supplement and elicit an opinion of the value of the taking that appeared in an earlier report. The report in the last discovery supplement valued the taking at $235, 970. Luedemann, however, testified that the taking was worth $51,069, a value contained in one of the early reports. Underwood contends the most recently produced report superceded the earlier reports.

Luedemann explained the discrepancies in values assigned by the various appraisal reports by testifying that he had prepared the various reports at the State's request, and the value rose with each report because the State asked him to use someone else's figures for the cost to cure the remainder after the taking. Throughout direct and cross-examination, Luedemann maintained that $51,069.00 was just compensation for Underwood's property.

There is no evidence in the record that Underwood was prejudiced by the introduction of this testimony. There is no dispute that the State provided each report to Underwood before trial. Underwood does not claim that it was unable to depose Luedemann before trial. Underwood had the opportunity to cross-examine Luedemann and elicit testimony about the discrepancies in values among the different reports.

Underwood neither cites cases, nor do we find any, that hold that a supplemental discovery response supercedes previous responses. To the contrary, "supplemental" means "[s]upplying something additional." BLACK'S LAW DICTIONARY 1438 (7th ed.1999). Accordingly, we hold that the trial court did not err in allowing Luedemann to testify that the value of the property was $51,069.00, an amount different than that contained in his last report.

We overrule Underwood's second issue presented.

We affirm the judgment.

Justice MIRABAL dissenting.

MARGARET GARNER MIRABAL, Justice, dissenting.

I respectfully dissent.

In my opinion, as a matter of law, during more than six years of road construction, appellant has suffered a partial permanent restriction of access to its property resulting in the property being "damaged" under article I, section 17 of the Texas Constitution.

Appellant operates a 300 to 400 unit warehouse. People store their belongings at appellant's warehouse. Before the construction, people transported their belongings to the warehouse for storage by rental vans, trucks with trailers, and 40–foot *Mayflower-type* vans. Before construction started, the 40–foot size vans would deliver personal belongings to the warehouse three or four times a month, utilizing four or five warehouse units to store the contents of the vans. The fact that the Mayflower-type vans strayed off the driveway as they made turns into the warehouse parking lot did not impede their access; there is no evidence the State ever complained about or objected to the tires crossing over the shell surface next to the driveway. A wider driveway is all that was needed.

The evidence shows that after construction began, the 40–foot Mayflower-type vans could no longer deliver belongings to the warehouse for storage because of the difficulty in turning off King Street and maneuvering between the two pylons and into the driveway.

As a matter of law, access rights to appellant's business were materially and substantially impaired. Therefore, appellant had the right to present evidence to the jury about damages it incurred, and the trial court erred in depriving appellant of that right. *See State v. Heal*, 917 S.W.2d 6, 9–11 (Tex.1996).

I would sustain issue one and remand the case for a new trial.